[941 NE2d 727, 915 NYS2d 884]

John Giordano, Appellant, v Market America, Inc., et al., Respondents.

Argued October 13, 2010; decided November 18, 2010

**POINTS OF COUNSEL**

*Pollack Pollack Isaac & DeCicco*, New York City (*Brian J. Isaac* of counsel), and *Sanders Sanders Block Woycik Viener &*

*Grossman, P.C.*, Mineola (*Martin Block* of counsel), for appellant. Triable issues of fact prevent summary resolution of the issue of untimeliness and the complaint should not be dismissed; CPLR 214-c (4) does not require a finding of latency; latency can be present where the injury occurs 24 to 48 hours after exposure to a substance; the proof in the scientific community is equivocal concerning the relationship between exposure to a substance and an injury, making summary dismissal of the complaint under the statute inappropriate. (*Giuffrida v Citibank Corp.*, 100 NY2d 72; *Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851; *Zuckerman v City of New York*, 49 NY2d 557; *Sillman v Twentieth Century-Fox Film Corp.*, 3 NY2d 395; *Alvarez v Prospect Hosp.*, 68 NY2d 320; *Branham v Loews Orpheum Cinemas, Inc.*, 8 NY3d 931; *Fundamental Portfolio Advisors, Inc. v Tocqueville Asset Mgt., L.P.*, 7 NY3d 96; *Rotuba Extruders v Ceppos*, 46 NY2d 223; *Andre v Pomeroy*, 35 NY2d 361; *Matter of Ocean Hill-Brownsville Governing Bd. v Board of Educ. of City of N.Y.*, 30 AD2d 447.)

*Fiedelman & McGaw*, Jericho (*Andrew J. Zajac* and *Neil L. Coscio* of counsel), and *Mound Cotton Wollan & Greengrass*, New York City (*Amy J. Kallal* and *Ellen G. Margolis* of counsel), for Market America, Inc., respondent. I. CPLR 214-c (4) is limited to actions for injuries caused only by the latent effects of exposure to a substance. (*Blanco v American Tel. & Tel. Co.*, 90 NY2d 757; *Germantown Cent. School Dist. v Clark, Clark, Millis & Gilson*, 100 NY2d 202; *Matter of New York County DES Litig.*, 89 NY2d 506; *Jensen v General Elec. Co.*, 82 NY2d 77; *Bano v Union Carbide Corp.*, 361 F3d 696; *Pompa v Burroughs Wellcome Co.*, 259 AD2d 18; *Enright v Eli Lilly & Co.*, 77 NY2d 377; *Rangolan v County of Nassau*, 96 NY2d 42; *Gonzalez v Iocovello*, 93 NY2d 539; *Mark G. v Sabol*, 93 NY2d 710.) II. An injury that occurs within 24 to 48 hours of exposure to a substance cannot be considered "latent" for purposes of CPLR 214-c. (*In re Ephedra Prods. Liab. Litig.*, 393 F Supp 2d 181; *Bano v Union Carbide Corp.*, 361 F3d 696; *Germantown Cent. School Dist. v Clark, Clark, Millis & Gilson*, 100 NY2d 202; *Manhattanville Coll. v James John Romeo Consulting Engr., P.C.*, 5 AD3d 637; *Dabb v NYNEX Corp.*, 262 AD2d 1079; *Di Marco v Hudson Val. Blood Servs.*, 147 AD2d 156; *Urie v Thompson*, 337 US 163; *Prego v City of New York*, 147 AD2d 165; *Asher v Unarco Material Handling, Inc.*, 596 F3d 313; *Pretus v Diamond Offshore Drilling, Inc.*, 571 F3d 478.) III. The degree of knowledge required to be "sufficient to ascertain" the cause of an injury is not medical or scientific certainty but,

rather, a probable causal connection. (*Pompa v Burroughs Wellcome Co.*, 259 AD2d 18; *Whitney v Agway, Inc.*, 238 AD2d 782; *Matott v Ward*, 48 NY2d 455.) IV. The relevant group that must possess the "technical, scientific or medical" knowledge is the scientific, technical or medical community, not a plaintiff and his or her attorneys. (*Freier v Westinghouse Elec. Corp.*, 303 F3d 176; *Matter of New York County DES Litig.*, 89 NY2d 506; *MRI Broadway Rental v United States Min. Prods. Co.*, 92 NY2d 421; *Pompa v Burroughs Wellcome Co.*, 259 AD2d 18; *Lonis v Norman's Roofing & Siding Co.*, 306 AD2d 922; *Water Auth. of W. Nassau County v Lockheed Martin Corp.*, 276 AD2d 624; *Annunziato v City of New York*, 224 AD2d 31.)

*Post & Post, LLC*, Berwyn, Pennsylvania (*Edward J. Stolarski, Jr.*, of counsel), for Chemins Company, Inc., respondent. I. The findings of Judge Rakoff, that the effects of ephedra are immediate—occurring within 24 to 48 hours—and are therefore patent, are well founded and should not be disturbed. (*Bano v Union Carbide Corp.*, 361 F3d 696; *In re Ephedra Prods. Liab. Litig.*, 393 F Supp 2d 181; *Matter of New York County DES Litig.*, 89 NY2d 506; *Jensen v General Elec. Co.*, 82 NY2d 77; *Anderson v Bessemer City*, 470 US 564; *Zervos v Verizon N.Y., Inc.*, 252 F3d 163; *United States v United States Gypsum Co.*, 333 US 364; *Martin v City of Cohoes*, 37 NY2d 162; *United States v United States Smelting Refining & Mining Co.*, 339 US 186; *Campbell ex rel. Campbell v Metropolitan Prop. & Cas. Ins. Co.*, 239 F3d 179.) II. CPLR 214-c (4) is to be read in conjunction with the provisions of CPLR 214-c and requires that a plaintiff's manifestation of injury from exposure to a substance be latent in order for CPLR 214-c (4) to apply. (*Bano v Union Carbide Corp.*, 361 F3d 696; *Matter of New York County DES Litig.*, 89 NY2d 506.) III. The knowledge of the general scientific and/or medical communities, and not the knowledge of the plaintiff himself, is the recognized standard in New York to determine whether sufficient information exists to link plaintiff's injury with the substance at issue. (*Freier v Westinghouse Elec. Corp.*, 303 F3d 176; *Pompa v Burroughs Wellcome Co.*, 259 AD2d 18; *In re Ephedra Prods. Liab. Litig.*, 393 F Supp 2d 181.)

**OPINION OF THE COURT**

SMITH, J.

The United States Court of Appeals for the Second Circuit has asked us three questions about the interpretation of CPLR 214-c (4), which extends the statute of limitations for certain

tort victims who do not, for some time, know the cause of their injuries. We answer the questions by holding that:

(1) the provisions of CPLR 214-c (4) are limited to actions for injuries caused by the latent effects of exposure to a substance;

(2) an injury that occurs within hours of exposure to a substance can be considered "latent" for these purposes; and

(3) "technical, scientific or medical knowledge and information sufficient to ascertain the cause of [the plaintiff's] injury" is "discovered, identified or determined" within the meaning of the statute when the existence of the causal relationship is generally accepted within the relevant technical, scientific or medical community.

I

Plaintiff suffered a series of strokes in March of 1999. The strokes were caused, we assume for present purposes, by ephedra, a substance contained in a dietary supplement that plaintiff had been using for about two years. Ephedra causes in some users a short-term elevation in blood pressure, heart rate or both, and a temporary constriction of certain blood vessels. This effect, which increases the risk of stroke, typically occurs within a few hours after ephedra is consumed.

Neither plaintiff nor the doctors who treated him for his strokes knew at the time that ephedra was to blame. When they could, or reasonably should, have known of the causal connection is disputed. The United States District Court for the Southern District of New York has found that studies published as early as 1996 suggested a link between ephedra and stroke, but that as late as 2005 scientific evidence did not establish the link "with any degree of medical or scientific 'certainty' " (*In re Ephedra Prods. Liab. Litig.*, 598 F Supp 2d 535, 536 [SD NY 2009]).

Plaintiff claims that he became aware of a possible link between ephedra and stroke in February 2003, when news reports suggested that the sudden death of a major league baseball player might have been caused by ephedra. On July 28, 2003—about four years, four months after his strokes—plaintiff sued the distributor of the product he had taken in New York State Supreme Court. The case was removed to federal court, the manufacturer of the product was added as a defendant, and the case was consolidated with other ephedra-related litigation in the Southern District of New York.

Defendants moved to dismiss the case as barred by the statute of limitations, relying on CPLR 214 (5), which imposes a three-year limitation period, with certain exceptions, on "an action to recover damages for a personal injury." It is undisputed that the claim is barred by CPLR 214 (5) unless it is saved by the exception in CPLR 214-c (4), which we quote in the next section of this opinion.

Defendants' statute of limitations motion generated a series of opinions in the District Court and the Second Circuit. Initially, the District Court granted the motion to dismiss (*In re Ephedra Prods.*, 2006 WL 944705, 2006 US Dist LEXIS 18691 [SD NY 2006]). Plaintiff appealed to the Second Circuit, which remanded the case for determination of an issue the District Court had not reached (*Giordano v Market Am., Inc.*, 289 Fed Appx 467 [2d Cir 2008]). Following the District Court's ruling on that issue (*In re Ephedra Prods. Liab. Litig.*, 598 F Supp 2d 535 [SD NY 2009]), the Second Circuit certified to us the three questions that we now address (*Giordano v Market Am., Inc.*, 599 F3d 87 [2d Cir 2010]).

## II

Directly in issue here is subdivision (4) of CPLR 214-c, which refers to subdivisions (2) and (3) of the same section. The text of the three relevant subdivisions is:

"2. Notwithstanding the provisions of section 214, the three year period within which an action to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body or upon or within property must be commenced shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier.

"3. For the purposes of sections fifty-e and fifty-i of the general municipal law, section thirty-eight hundred thirteen of the education law and the provisions of any general, special or local law or charter requiring as a condition precedent to commencement of an action or special proceeding that a notice of claim be filed or presented within a specified

period of time after the claim or action accrued, a claim or action for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances, in any form, upon or within the body or upon or within property shall be deemed to have accrued on the date of discovery of the injury by the plaintiff or on the date when through the exercise of reasonable diligence the injury should have been discovered, whichever is earlier.

"4. Notwithstanding the provisions of subdivisions two and three of this section, where the discovery of the cause of the injury is alleged to have occurred less than five years after discovery of the injury or when with reasonable diligence such injury should have been discovered, whichever is earlier, an action may be commenced or a claim filed within one year of such discovery of the cause of the injury; provided, however, if any such action is commenced or claim filed after the period in which it would otherwise have been authorized pursuant to subdivision two or three of this section the plaintiff or claimant shall be required to allege and prove that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined prior to the expiration of the period within which the action or claim would have been authorized and that he has otherwise satisfied the requirements of subdivisions two and three of this section."

The three questions that the Second Circuit has asked us are:

"1. Are the provisions of N.Y. C.P.L.R. § 214-c(4) providing for an extension of the statute of limitations in certain circumstances limited to actions for injuries caused by the latent effects of exposure to a substance?

"2. Can an injury that occurs within 24 to 48 hours of exposure to a substance be considered 'latent' for these purposes?

"3. What standards should be applied to determine whether a genuine issue of material fact exists for resolution by a trier of fact as to whether 'technical,

scientific or medical knowledge and information sufficient to ascertain the cause of [the plaintiff's] injury' was 'discovered, identified or determined' for N.Y. C.P.L.R. § 214-c(4) purposes?" (599 F3d at 101.)

We answer yes to both of the first two questions; thus, our answers are favorable to defendants on question one but to plaintiff on question two. We answer question three by saying, as we explain more fully below, that the test is one of general acceptance in the relevant technical, scientific or medical community.

Question One: Is the statute limited to injuries caused by latent effects?

CPLR 214-c (2), providing a statute of limitations that runs "from the date of discovery of the injury . . . or from the date when . . . such injury should have been discovered," is expressly restricted to cases of injury "caused by the latent effects of exposure to any substance or combination of substances." CPLR 214-c (3), relating to notice of claim requirements, contains an identical restriction. The Second Circuit's first question is, in essence, whether the same restriction is incorporated into CPLR 214-c (4), governing cases in which "discovery of the cause of the injury" was allegedly delayed. We conclude that it is.

CPLR 214-c (4) mentions "subdivisions two and three of this section" three times. The third mention, we conclude, answers the Second Circuit's question: "[T]he plaintiff or claimant shall be required to allege and prove . . . that he has otherwise satisfied the requirements of subdivisions two and three of this section." Since subdivisions (2) and (3) require that the claim or action be one for injury "caused by the latent effects" of exposure, subdivision (4), on its face, also imposes a latency requirement.

Even if subdivision (4) could be read otherwise—if it could be read as creating an independent exception to the general three-year statute of limitations, not one dependent on the provisions of subdivisions (2) and (3)—such a reading would be inconsistent with the statute's history and purpose. CPLR 214-c was enacted in 1986 to give relief to plaintiffs in certain toxic tort cases. Its legislative history, which we discussed in *Matter of New York County DES Litig.* (89 NY2d 506, 513-514 [1997]), shows that it was intended to overrule decisions in which we had held that toxic tort claims accrued upon exposure, even

though the illness resulting from that exposure might be long delayed (*see e.g. Fleishman v Lilly & Co.*, 62 NY2d 888 [1984]; *Schwartz v Heyden Newport Chem. Corp.*, 12 NY2d 212 [1963]). The Legislature's concern when it enacted the statute was the problems raised by toxic tort cases in which the latency of a substance's effect could prevent the plaintiff from bringing a timely lawsuit.

Plaintiff stresses that the word "latent" does not appear in CPLR 214-c (4). Indeed, the words "exposure to any substance" do not appear there either. But the whole point of CPLR 214-c was to deal with substance exposure cases. No other kind of case is discussed in the legislative history, and the Governor, when he signed the bill, identified it as the "Toxic Tort Bill" (*see* Public Papers of Governor Cuomo, *Governor Approves Toxic Tort Bill* [July 30, 1986]). It can hardly be argued, and plaintiff does not argue, that CPLR 214-c (4) extends beyond substance exposure cases—that for example, it would benefit a plaintiff injured by a hit and run driver or an unidentified falling object. It is thus undisputed that the words "exposure to any substance" in subdivisions (2) and (3) are incorporated into subdivision (4) of CPLR 214-c. We see no possible reading of the statute under which those words are incorporated but the word "latent" is not.

Question Two: Can an effect that appears within a matter of hours be considered "latent"?

While we think it clear that CPLR 214-c (4) is limited to injuries from "latent effects," whether effects that are concealed only briefly count as "latent" is a harder question. The Second Circuit's question to us implies that the harmful effects of ephedra show themselves within "24 to 48 hours of exposure." Opinions of the District Court suggest that the time may be even shorter—a matter of a "few hours" (*In re Ephedra Prods. Liab. Litig.*, 393 F Supp 2d 181, 193 [SD NY 2005]; *see also In re Ephedra Prods.*, 2006 WL 944705, *1, 2006 US Dist LEXIS 18691, *3). This discrepancy need not concern us, because we conclude that even effects concealed for a few hours may be "latent" within the meaning of the statute.

The dictionary definition of "latent" is "not now visible, obvious, active, or symptomatic" (Merriam-Webster's Collegiate Dictionary 702 [11th ed 2003]). Using that word to describe a condition that exists only for hours puts no strain on its literal meaning. But in interpreting this statute, it might intuitively seem that so brief a period of latency should be disregarded as

insignificant—that, as the District Court put it in its opinion granting defendants' motion to dismiss, to treat the stroke-causing effects of ephedra as latent "would effectively eliminate the statute's limitation to 'latent effects' " (*In re Ephedra Prods.*, 2006 WL 944705, \*1, 2006 US Dist LEXIS 18691, \*4). In fact, however, even a brief period of latency can be important when the problem is one of determining an injury's cause—the problem with which CPLR 214-c (4) is concerned.

Perhaps the task, often confronted by doctors or scientists, of finding a causal connection between exposure to a toxic substance and an injury is never an easy one. It is certainly less difficult, however, when the effect of the toxic substance can be seen immediately—when, for example, someone breaks out in a rash as soon as his skin touches a suspected toxin. Or, to suggest an example closer to this case, if plaintiff had suffered symptoms of a stroke at once upon swallowing a pill containing ephedra, his chances and those of his doctors of inferring the causal link would have been immeasurably better. Indeed, if that had occurred, it seems highly likely that plaintiff could have discovered the cause of his injury within the normal three-year limitation period. But because his symptoms showed themselves hours later, it may have been very hard to say whether ephedra and the strokes were causally connected.

Thus cases where a toxin's effects are latent for hours are much more likely than those in which there is no latency period to present the problem addressed by CPLR 214-c (4): a difficulty in promptly learning the cause of an injury. It is entirely plausible that several hours' delay in the manifestation of symptoms could lead to a delay of years in detecting an injury's cause. It thus seems reasonable that the authors of CPLR 214-c (4) would have considered even a few hours of latency enough to justify the extension of the statute of limitations authorized by that subdivision.

Defendants, and our dissenting colleagues, argue otherwise, contending that, as we said in *New York County DES*, the legislative history of CPLR 214-c shows that the Legislature that enacted it was concerned with long-term latency—with plaintiffs who were unaware that they had been injured "until after the limitations period had expired" (89 NY2d at 514 [internal quotation marks omitted]). There is no doubt that the problem of injuries that go undiscovered for years was the Legislature's primary concern. But that was not its sole concern, for if it was there was no need to enact subdivision (4) of CPLR

214-c at all. That subdivision benefits only those plaintiffs and claimants who, having already discovered they were injured, have not discovered "the cause of the injury." A few hours of latency might well cause a plaintiff to be in such a predicament—as plaintiff here says he was.

Defendants, and the dissenters, argue in substance that the benefits of CPLR 214-c (4) should be afforded only to those plaintiffs and claimants who also benefit from CPLR 214-c (2) or (3)—i.e., those who cannot discover their injury within the limitations period. But the statute does not say that, and we see no reason to read it in that way. Defendants' and the dissent's reading would produce anomalous results. Those who benefit from subdivisions (2) and (3) may bring suits or make claims many years, even decades, after their exposure to a substance. For such plaintiffs and claimants, it is undisputed, the already-long delay can be extended by subdivision (4) for up to another six years (five years from the discovery of the injury to the discovery of its cause, plus another year to sue or file a claim). But defendants and the dissenters would deny the benefit of subdivision (4) to plaintiffs, like the present one, whose injuries are discovered within hours of exposure—even though subdivision (4) would effectively require those plaintiffs to sue no more than six years after that exposure.

In other words, for plaintiffs like the present one, subdivision (4) would replace the three-year tort statute of limitations with at most a six-year statute—an extension less generous to plaintiffs, and risking less hardship to defendants, than the indefinite extensions that can result from long-term latency. Defendants and the dissent would have us read the statute to countenance extremely old claims, but to bar relatively fresh ones. We reject that reading.

Question Three: What standards apply to the issue of when sufficient information "to ascertain the cause" of an injury has been "discovered, identified or determined"?

The Second Circuit's third question arises from CPLR 214-c (4)'s requirement that plaintiff "allege and prove that technical, scientific or medical knowledge and information sufficient to ascertain the cause of his injury had not been discovered, identified or determined" before the expiration of the otherwise-applicable limitation period. That question calls on us to resolve two possible ambiguities noted by both the District Court and the Second Circuit: Is it the plaintiff and his lawyers or the technical, scientific or medical community that must be able to

"ascertain the cause of his injury"? And what level of certainty is implied by the word "ascertain"? Both aspects of this question have been previously addressed by New York courts.

■ As to the first of them, we said in *New York County DES*: "It is apparent from the over-all statutory plan . . . that only the technical knowledge of the scientific and medical communities [was] to be considered in determining whether the injured's delay following the discovery of injury should be excused" (89 NY2d at 515). We now reaffirm that the statute refers to the time when information is sufficient for the technical, medical or scientific community "to ascertain" the cause of an injury. It is not reasonable to extend the statute of limitations until the time when a reasonable layperson or lawyer could "ascertain" the cause without consulting an expert—in many cases, that time might never come. Plaintiff suggests that the statute of limitations in his case did not begin to run until the relevant scientific findings were publicized in the non-expert community, but the statute's language does not create a "publicity" test. We see no unfairness in requiring that injured people who want to protect their rights seek out expert advice, rather than waiting for the media to bring a possible cause of the injury to their attention.

The other aspect of the Second Circuit's third question—the issue of what level of certainty "to ascertain" implies—is not one we have previously discussed. We generally agree, however, with the Appellate Division's comments on that issue in *Pompa v Burroughs Wellcome Co.* (259 AD2d 18 [3d Dept 1999]). The statute "does not require medical certainty or information sufficient to prevail at trial, but does entail showing that sufficient information and knowledge existed to enable the medical or scientific community to ascertain the probable causal relationship between the substance and plaintiff's injury" (*id.* at 24).

Making the Appellate Division's "probable causal relationship" test a bit more specific, we hold that the test is one of general acceptance of that relationship in the relevant technical, scientific or medical community. That test is familiar to New York lawyers and judges. Our courts follow *Frye v United States* (293 F 1013 [DC Cir 1923]) in making "general acceptance" the test for admitting expert testimony about scientific principles or discoveries (*see People v LeGrand*, 8 NY3d 449, 457 [2007]; *People v Wesley*, 83 NY2d 417, 422 [1994]). Thus, under our holding today a causal relationship will be sufficiently ascertained for CPLR 214-c (4) purposes at, but not before, the

point at which expert testimony to the existence of the relationship would be admissible in New York courts.

The above, we believe, answers the Second Circuit's third question: "What standards should be applied?" We have not been asked to, and do not, apply those standards to the facts of this case. The federal courts dealing with this and related cases are more familiar than we with the science relating to the effects of ephedra, and are thus better able to perform that task.

Accordingly, the first and second questions should be answered in the affirmative, and the third question should be answered in accordance with this opinion.

READ, J. (dissenting). The majority opines that "effects [of an exposure to substances] concealed for a few hours may be 'latent' " for purposes of CPLR 214-c because "even a brief period of latency can be important when the problem is one of determining an injury's cause" (majority op at 598, 599). In effect, the majority defines effects as "latent" so long as symptoms do not appear "as soon as [someone's] skin touches a suspected toxin" or "at once upon swallowing a pill" (*id.* at 599). And whatever "as soon as" and "at once" may mean, it would seem to be something less than the 24 to 48 hours referred to in the second certified question. This approach finds no support in the statutory text or legislative history, which uniformly demonstrate that section 214-c was intended to relieve the plight of plaintiffs who became sick long after their *initial* exposure to a toxic substance, which is when their causes of action would otherwise accrue.

I

A latent disease is generally understood to be an illness that does not manifest clinically diagnosable symptoms until years after initial exposure to the disease-causing agent (*see e.g.* David Schottenfeld and Joanna F. Haas, *Carcinogens in the Workplace,* in Cancer Causing Chemicals, at 23 [N. Irving Sax ed 1981]). And as we have recounted numerous times, the Legislature enacted CPLR 214-c to "overcome the effect of a line of Court of Appeals decisions," beginning with *Schmidt v Merchants Despatch Transp. Co.* (270 NY 287 [1936]), which held that the claims of plaintiffs suffering from latent diseases "accrue[d] upon 'impact' or exposure even though the resulting illness [might not have been] manifested for *a long time thereafter*" (*Matter of New York County DES Litig.*, 89 NY2d 506, 513

[1997] [emphasis added]; *see also Snyder v Town Insulation*, 81 NY2d 429, 433 [1993] [noting that *Schmidt* and its progeny addressed the "question of how accrual should be determined when *an injury was latent and went undiscovered until long after exposure*" (emphasis added)]; *Consorti v Owens-Corning Fiberglas Corp.*, 86 NY2d 449, 454 [1995] [reviewing history of Court's adherence to "the *Schmidt* rule fixing the occurrence of tortious injury as the date when the toxic substance *invades or is introduced into the body*" (emphasis added)]). As a result of the *Schmidt* rule, the three-year statute of limitations in CPLR 214 (5) lapsed before these plaintiffs even became aware they were sick.

To remedy this injustice, the Legislature adopted CPLR 214-c, which replaced the *Schmidt* rule in such cases with a rule of accrual keyed to "the discovery of the manifestations or symptoms of the latent disease that the harmful substance produced" (*Matter of New York County DES Litig.*, 89 NY2d at 514). Section 214-c, adopted as a part of a larger tort reform package (L 1986, ch 682), reflected numerous compromises. In particular, the bills passed by the Assembly in the run-up to the Legislature's adoption of CPLR 214-c invariably provided for accrual not only upon discovery of the injury, but also upon discovery of the injury's cause. For example, in 1984 the Assembly passed Assembly Bill A3547-A, which called for commencement of an action for personal injuries attributable to the latent effects of exposure to a substance "within two years from *the date of discovery of the illness or injury*, or the date of death, *or the discovery of the cause* of such injury, illness, or death, *whichever is later*" (emphases added). By contrast, the Senate majority's versions of a time-of-discovery rule did not require discovery of causation before the statute of limitations would begin to run (*see generally* Steven L. White, Note, *Toward a Time-of Discovery Rule for the Statute of Limitations in Latent Injury Cases in New York State*, 13 Fordham Urb L J 113, 154-160 [1984-1985]).

The Legislature ultimately compromised on this issue and adopted related time-of-discovery provisions for actions brought by plaintiffs to recover for latent injuries, CPLR 214-c (2) and (4). CPLR 214-c (2) enacts a three-year statute of limitations commencing upon a plaintiff's discovery (actual or constructive) of latent injuries from exposure to a substance. This provision assumes that the plaintiff knows the cause of the injuries at the time they are discovered—i.e., become manifest (*see generally*

*Matter of New York County DES Litig.*, 89 NY2d at 513 ["That CPLR 214-c (2)'s reference to 'discovery of the injury' was intended to mean discovery of the condition on which the claim was based and nothing more is . . . apparent from the legislative history of the provision"]).

Section 214-c (4), which "has to be read in conjunction with subdivision 2" (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C214-c:4, at 634 [1990 ed]; *see also New York Adopts a "Discovery" Rule for Exposure Cases—And Even Offers a Short Time in Which to Revive Expired Claims*, Siegel, NY St L Dig, No. 321, at 1 [Sept. 1986]), specifies that if the cause of the injury is discovered less than five years after the injury is suffered, the plaintiff may commence an action within one year after identifying the cause. In order to take advantage of section 214-c (4), however, the plaintiff must show that there was insufficient medical or scientific information available to make out the injury's cause within the three-year period otherwise prescribed in CPLR 214-c (2) (*see id.* [commenting that "(t)he issues of causation and knowledge on which this alternative time measure depends will often generate heavy fact disputes . . . likely to be intertwined with the merits"]).

The majority acknowledges that "[t]here is no doubt that the problem of injuries that go undiscovered for years was the Legislature's primary concern," but then adds that this was not the Legislature's

> "sole concern, for if it was there was no need to enact subdivision (4) of CPLR 214-c at all. That subdivision benefits only those plaintiffs . . . who, having already discovered they were injured, have not discovered 'the cause of the injury.' A few hours of latency might well cause a plaintiff to be in such a predicament" (majority op at 599-600).

As Judge McLaughlin (coincidentally a member of the Second Circuit panel in this case) observed, "[i]t need not be said that [CPLR 214-c (4)] is a complicated statute," which "reeks of the midnight oil of political compromise. And the draftsmanship cannot be described as commendable" (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C214-c:4, at 635 [1990 ed]). There is no suggestion in the statutory text or the legislative history or the contemporary commentary, however, that the Legislature adopted section 214-c (4)

to address *any* effects of exposure to substances so long as the cause was difficult to figure out when the injuries became manifest, as the majority concludes. Rather, the Legislature was concerned only with the *latent* effects of exposure—i.e., latent diseases triggered by (but manifest well after) an initial (and sometimes prolonged) exposure to a toxic substance. Section 214-c (2) and (4) simply represent the compromise struck by the Assembly and the Senate to reconcile their differing time-of-discovery rules for latent diseases, previously discussed.

The majority further speculates that "it seems reasonable that the authors of CPLR 214-c (4) would have considered even a few hours of latency enough to justify the extension of the statute of limitations authorized by that subdivision" (majority op at 599). If this was part of the authors' design, they kept it well hidden. The statute's legislative history evidences only a desire to enact a time-of-discovery rule for plaintiffs afflicted with latent diseases, such as workers exposed to asbestos or the adult daughters of mothers who ingested DES during pregnancy, not a free-floating intention to alter the accrual rule in every case where a disease's etiology is difficult to divine.

## II

In this case, the scientific evidence does not provide a sound basis for a jury to conclude that plaintiff's strokes were a latent effect of his exposure to dietary supplements containing ephedra. At least, this is what I glean from the District Court's opinion addressing general causation (*see In re Ephedra Prods. Liab. Litig.*, 393 F Supp 2d 181 [SD NY 2005]), handed down in the consolidated ephedra litigation, and the same Judge's later decision concluding that this plaintiff's lawsuit was time-barred.

Ephedra is a plant that contains several chemically related biologically active substances known as ephedrine alkaloids. The ephedra products at issue in the consolidated litigation combined ephedra with caffeine, and were marketed to consumers seeking weight loss, increased energy and improved athletic performance (*id.* at 185-186). The District Court Judge conducted a *Daubert* hearing to assess, as particularly relevant here, whether evidence might be introduced at trial that dietary supplements containing ephedra/ephedrine cause strokes.

After a two-week evidentiary hearing at which various scientists testified as generic experts for plaintiffs and the defense, the District Court Judge concluded that none of plaintiffs' experts would be permitted to testify "with any

degree of medical or scientific 'certainty' " that ephedra causes strokes (*id.* at 187). He did, however, also rule that some of plaintiffs' experts would be permitted to testify (based on such things as animal studies, analogous human studies, and plausible theories of the biological mechanisms involved) that there was a reliable basis to believe that ephedra might be a contributing cause of strokes in people with, for example, high blood pressure or a genetic sensitivity to ephedra—provided that such experts qualified their testimony with the acknowledgment that none of this had been the subject of a definitive study and might in the future be disproved (*id.* at 186-187).

The biologically plausible theory about how ephedra might cause injury—one of the factors that persuaded the District Court Judge to allow some of plaintiffs' generic experts to offer an opinion that ephedra might be a contributing cause of strokes in susceptible individuals—was that ephedra was known to "stimulate cardiovascular activity and constrict blood vessels, thereby increasing stress on the heart and circulatory system" (*id.* at 194; *see also id.* at 192 n 8 [discussing hypothesis that heart attacks, strokes or sudden death might be triggered by the coincidence of peak events, such as transient peak blood pressure due to other causes, occurring at the same time as peak ephedrine blood level]). The Judge also noted that ephedra is short-acting (*id.* at 193).

The District Court Judge subsequently dismissed plaintiff's complaint as time-barred under CPLR 214-c. He specifically commented that

> "evidence admitted during the Court's extensive *Daubert* hearings showed that ephedra acts within a few hours to cause a *transitory elevation* of blood pressure and heart rate and a *temporary constriction* of certain blood vessels. . . . Experts designated by [plaintiff] have submitted reports stating that *these immediate effects* of ephedra may likely be a contributing cause of stroke in some people" (*In re Ephedra Prods.*, 2006 WL 944705, *1, 2006 US Dist LEXIS 18691, *3-4 [SD NY 2006] [emphases added]).

He then cited a decision by the Second Circuit holding that an injury manifest "within a few weeks" after exposure to a toxic substance was latent and therefore governed by section 214-c (2006 WL 944705 at *1, 2006 US Dist LEXIS 18691 at *4). The

Judge observed, however, that "[b]y contrast" with this decision, "researchers in a study of ephedra and stroke . . . did not consider stroke patients to have been relevantly exposed . . . unless they used [ephedra] within three days before their stroke"; and that "indeed, because of ephedra's short-acting properties, the researchers studied strokes that occurred within 24 hours after using ephedra." (*Id.*) He therefore concluded that "[t]o hold § 214-c applicable to a stroke allegedly caused by ephedra would effectively eliminate the statute's limitation to 'latent effects.' " (*Id.*)

In other words, based upon scientific evidence adduced at the *Daubert* hearing and credited by the District Court Judge, he concluded that any stroke attributable to ephedra would have been caused by an exposure occurring shortly (24 hours to three days) beforehand. This is because ephedra is short-acting and its effects transitory, not permanent; therefore, it is not biologically plausible for plaintiff's strokes to have been caused by his initial exposure to ephedra, or the cumulative effect of his exposures over time. As a result, plaintiff's strokes were not a latent disease within the meaning of section 214-c (4).

Plaintiff's attorney argues in his reply brief that "assuming latency is a requirement for applying [CPLR 214-c (4)], same is present because the stroke resulted from ingestion of the product over time"; and that "plaintiff did become ill after using Ephedra based products for two years."[*] In other words, he proposes that it was, in fact, plaintiff's initial and repeated exposures to ephedra over a two-year period which rendered him susceptible to a stroke by effecting permanent physiological change, presumably by creating a condition of permanently elevated blood pressure. I simply do not think the District Court Judge accepted as reasonably based on good science the notion that ephedra might act on the human body to cause a stroke in this manner (*see e.g.* 393 F Supp 2d at 194 [noting three points on which the scientific evidence is "sparse and inconclusive"]). If I am wrong about that, I would agree with plaintiff that section 214-c (4) governs the timeliness of his cause of action, and

---

[*] Plaintiff's attorney does not indicate how frequently plaintiff may have ingested ephedra over a two-year period. The District Court Judge noted that the label on one of the ephedra products did not state any maximum period for continuing the daily "suggested use" of up to 96 milligrams, while a competing product recommended a maximum daily dosage for a healthy adult of no more than 100 milligrams in a 24-hour period for not more than 12 weeks (393 F Supp 2d at 194 n 10).

that this would be the case whether he suffered a stroke 24 hours or 24 years after he last ingested ephedra.

### III

The majority's interpretation of section 214-c (4)—divorcing it from whether the exposure to a substance may have caused a latent disease and focusing solely on the lapse of time from last exposure to manifestation of illness—creates a number of practical problems. The Second Circuit asked if injuries occurring within 24 to 48 hours after exposure to a substance were "latent" within the meaning of section 214-c. In response, the majority holds that "an injury that occurs *within hours* of exposure to a substance can be considered 'latent' for these purposes" (majority op at 594 [emphasis added]). Is "within hours" the same as 24 to 48 hours, or is it a shorter period of time? What about 12 hours? Eight hours? Presumably, "within hours" must mean at least two hours, or does it? Is this purely a legal judgment, or is scientific evidence relevant? When an effect occurs "within hours" of exposure to a substance, does it matter whether a scientist would consider such an effect to be latent?

The majority acknowledges that a disease is not latent if symptoms appear "as soon as" or "at once" upon exposure. Indeed, the majority almost has to make this concession or it would be even more obvious than it already is that section 214-c (4) now covers lawsuits relating to the "effects"—not just the "latent" effects—of exposure to a substance, despite the majority's answer to the first certified question. But what do "as soon as" or "at once" mean in this context? Most substances that are ingested, for example, are not instantaneously absorbed. Does whether an injury is latent depend upon scientific evidence about how quickly a substance is taken up in the body or reaches a certain concentration in the blood?

It is difficult to predict the practical effects of the majority opinion. Certainly we now have a six-year statute of limitations in New York, running from the date an injury becomes manifest, for every purported side effect of a drug or other substance that may be ingested, subject to the restrictions in section 214-c (4)—the five-year and one-year limits and the necessity for proof about the state of medical or scientific evidence at the relevant time. Because there is no reason to believe that the Legislature had any such result in mind when it enacted CPLR 214-c (4), I respectfully dissent.

Chief Judge LIPPMAN and Judges CIPARICK and JONES concur with Judge SMITH; Judge READ dissents in a separate opinion in which Judges GRAFFEO and PIGOTT concur.

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of the Rules of Practice of the New York State Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified questions answered in accordance with the opinion herein.